AO 91 (Rev. 5/85) Criminal Complaint

# United States District Court

## WESTERN DISTRICT OF NEW YORK

**UNITED STATES OF AMERICA**

**v.**

**LEN WAH CHONG, a/k/a "Lisa Tsui",
CHE NGAN TSUI, a/k/a "Allen Tsui",
KIM POH CHONG and
WEI ZHANG, a/k/a "Wendy"**

# CRIMINAL COMPLAINT
## (REDACTED)

**CASE NUMBER:  07-M-1095**

(Name and Address of Defendants)

I, the undersigned complainant, being duly sworn state the following is true and correct to the best of my knowledge and belief.  From on or about September, 2006 to December, 2007, in  Erie  County, in the  Western  District of  New York   and elsewhere, the Defendants did, (Track Statutory Language of Offense)

keep, maintain, control, support, and harbor in any house and place; to wit: Golden Accupressure, 3571 Niagara Falls Blvd., #14, Wheatfield, NY 14120; Lucky J Fortune Teller, 3571 Niagara Falls Blvd., #13, Wheatfield, NY 14120; Lotus Accupressure Spa, 225 East Avenue, lower, Lockport, NY 14094; Lotus Spa, 446 Third Street, Niagara Falls, NY 14301, and Lotus Accupressure, 2302 Niagara Falls Blvd., Tonawanda, NY 14150, for the purpose of prostitution, and for any other immoral purpose, individuals, knowing and in reckless disregard of the fact that the individuals were aliens, and did fail to file within five business days after commencing to keep, maintain, control, support, and harbor in said house and place, a written statement with the Commissioner of Immigration and Naturalization, and his successor, setting forth the names of such individuals, the place at which the individuals are kept, and all the facts as to the date of the individuals' entry into the United States, the port through which the individuals entered, the individuals' ages, nationality, and parentage, and concerning the individuals' procuration to come to this country within the knowledge of the defendant in violation of Title 18, United States Code, Section 2424(a) and 2, and did conspire with one another, and others, to commit said offense against the United States in violation of Title 18, United States Code, Section 371.  See Homeland Security Act of 2002, Pub.L.No. 107-296, Sections 402, 441 and 1517 (Nov 25, 2002), codified at 6 U.S.C.A. Sections 202(3), 251 and 557.

I further state that I am a  Special Agent with the Federal Bureau of Investigation
Official Title

and that this complaint is based on the following facts:

     See attached affidavit.

Continued on the attached sheet and made a part hereof:     ( X ) Yes     (   ) No

Signature of Complainant
JENNIFER J. AMO
Special Agent
Federal Bureau of Investigation

Sworn to before me and subscribed in my presence,

December 12, 2007                           at   Buffalo, New York
Date                                              City and State

HONORABLE JEREMIAH J. McCARTHY
U.S. MAGISTRATE JUDGE
Name & Title of Judicial Officer                    Signature of Judicial Officer

**AFFIDAVIT**

STATE OF NEW YORK )
COUNTY OF ERIE         )     SS:
CITY OF BUFFALO     )

**Jennifer J. Amo**, being duly sworn, deposes and states:

1.  I am an "investigative or law enforcement officer" within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of, and to make arrests for, offenses enumerated in Title 18, United States Code, Section 2516.

2.  I have been employed as a Special Agent (SA) of the Federal Bureau of Investigation (FBI) for almost nine years. Your affiant was previously employed as a SA for the Immigration and Naturalization Service (INS) in Los Angeles, California for three years. Prior to that, I was employed as an Immigration Inspector, for INS in Washington, D.C. and San Francisco, California. I am currently assigned to the Buffalo, New York, FBI office, assigned to a Public Corruption and White Collar Crime squad which also investigates civil rights cases. I am currently assigned to the civil rights program, which includes the investigation of human trafficking cases

3.   I worked on a Eurasian Organized Crime Squad for six years in Los Angeles, five of those years I worked on a task force in Glendale, California, named the Eurasian Organized Crime Task Force (EOCTF).   The EOCTF, comprised of FBI, Glendale Police Department, Los Angeles County Sheriff's Department and National Insurance Crime Bureau personnel, specialized in the investigation of Russian, Armenian and other Eurasian criminal enterprises.   I have attended a variety of training courses regarding Eurasian Organized Crime and human trafficking.   I have traveled overseas to make a presentation on Eurasian Organized Crime in the United States at the International Law Enforcement Academy in Budapest, Hungary.

4.   During my employment with the INS and the FBI, I have participated in the investigation of organizations involved in extortion, car jacking, money laundering, wire fraud, human trafficking, kidnaping, murder-for-hire, insurance fraud, medical fraud, bank fraud, and false statements.   These investigations have involved the use of physical surveillance, cooperating witnesses, financial and telephone toll record analysis, interception of wire and cellular telephone communications, and the execution of search and arrest warrants.

5. During the investigation described below, I have participated with other Special Agents of the FBI, United States Border Patrol (USBP), Immigration and Customs Enforcement and the Niagara County Sheriff's Department  while conducting interviews, physical surveillance, background investigations, consensually monitored meetings, wire intercepts, and while examining financial records, pen registers and trap/trace data, and telephone subscriber/toll records pertaining to the investigation of the offenses described above.  I have spoken to other agents, law enforcement officials, and other interested individuals about this investigation, and have written and read reports concerning the progress of the investigation.  As a result, I am fully familiar with all aspects of this investigation.  The statements contained in this affidavit are based, in part, on information that has been provided to me directly or indirectly by Special Agents of the FBI, the USBP, ICE, confidential informants, and on my experience and training as a Special Agent of the FBI.

6. Since this affidavit is being submitted for the limited purpose of obtaining search warrants for certain premises and a Complaint against certain defendants, I have not included each and every fact known to me concerning this investigation.  Throughout this affidavit, I have included parenthetical explanations to assist the reader in interpreting code words used by the target

3

subjects to discuss the criminal activities.   These parenthetical descriptions are based on my training and experience in investigating human trafficking and prostitution cases, including the instant investigation.

## I.   IDENTIFICATION OF PERSONS TO BE CHARGED IN COMPLAINT

7.   This affidavit is made in support of an application for a complaint and arrest warrants for four (4) persons who have been identified during the course of this investigation as persons who keep, maintain, control, support, and harbor in the various premises, female aliens for the purpose of prostitution and/or any other immoral purpose without filing the requisite statement with immigration authorities, and who have conspired with one another to do the same.

a.   **LEN WAH CHONG**, a/k/a Lisa Tsui, (hereinafter, "CHONG") is an Asian female with a date of birth of                    , Social Security Number (SSN)              .   According to New York State Department of Motor Vehicle records, CHONG currently resides at 1077 Bowen Drive West, North Tonawanda, New York.   National Crime Information Center (NCIC) records indicate that CHONG has no

criminal history.   CHONG is a naturalized citizen of the United States.

b.   **CHE NGAN TSUI**, a/k/a Allen Tsui, (hereinafter, "TSUI"), is an Asian male with a date of birth of                 , SSN

.   TSUI  is married to CHONG, and according to New York State Department of Motor Vehicle records, currently resides with CHONG at 1077 Bowen Drive West, North Tonawanda, New York.   NCIC records indicate that TSUI has no criminal history.   TSUI is a naturalized citizen of the United States.

c.   **KIM POH CHONG** (hereinafter, "K. CHONG"), is an Asian male, date of birth,                 , SSN                 .   K. CHONG is CHONG's brother and according to New York State Department of Motor Vehicle records, resides with CHONG and TSUI at 1077 Bowen Drive West, North Tonawanda, New York.   NCIC records indicate that K. CHONG was arrested on December 20, 1984, in Old Saybrook, Connecticut for Evading Responsibility and Interfering with an Officer.   A disposition in this arrest was not reported on the NCIC report.   K. CHONG is a naturalized citizen of the United States.

d.   **WEI ZHANG**, a/k/a Wendy (hereinafter, ZHANG) is an Asian female, date of birth,                 , SSN                 .   ZHANG is the wife of K. CHONG and according to New York State Department

of Motor Vehicle records, resides with CHONG, K. CHONG and TSUI at 1077 Bowen Drive West, North Tonawanda, New York.   NCIC records indicate that ZHANG has no criminal history.   ZHANG is a permanent resident of the United States.

## II.   DESCRIPTION OF PREMISES TO BE SEARCHED

8.   I also make this affidavit in support of an application for a warrant to search the following premises:   Golden Accupressure, 3571 Niagara Falls Blvd., #14, Wheatfield, New York 14120 (hereinafter, **"Premises 1"**); Lucky J Fortune Teller, 3571 Niagara Falls Blvd., #13, Wheatfield, New York 14120 (hereinafter, **"Premises 2"**); Lotus Accupressure Spa, 225 East Avenue, Lower, Lockport, New York 14094 (hereinafter, **"Premises 3"**); Lotus Spa, 446 Third Street, Niagara Falls, New York 14301 (hereinafter, **"Premises 4"**) 1077 Bowen Drive West, North Tonawanda, New York 14120, (hereinafter, **"Premises 5"**) Lotus Accupressure, 2302 Niagara Falls Blvd., Tonawanda, New York 14150 (hereinafter, **"Premises 6"**). A photograph of each structure is attached as an exhibit and incorporated by reference.

The premises are more particularly described as follows:

a) **Premises 1** is more particularly described as a one story red brick type building with mostly windows covering the front. The main entrance consists of one glass door with a blind drawn down most of the door. There is a black and yellow sign above the main entrance containing the words "Golden Accupressure" and the numbers "695-0765." The premise is located on the most northern side of the plaza. The main entrance is facing Niagara Falls Blvd., Wheatfield, New York (Exhibit A).

b) **Premises 2** is more particularly described as a one story red brick type building with mostly windows covering the front. The main entrance consists of one glass door with a blind drawn most of the door. Just above the front door there is a window containing the black numbers "3571." There is a yellow and black sign above the main entrance containing the words "Lucky "J" Fortune Teller." Black numbers "695-0088" appear on two of the front windows. Green letters "JADE" appears in between the two black numbers. Yellow letters "GIFT SHOP" also appear between the two black numbers and below the letters "JADE." The premise is located on the northern side of the plaza directly to the right of Golden Accupressure. The main entrance is facing Niagara Falls Blvd., Wheatfield, New York (Exhibit B).

7

c) **Premises 3** is more particularly described as a two story grey sided building, with a black sign located on the front lawn containing the words "Lotus Spa," and the numbers "433-5606" The main entrance consists of a front porch with double white doors. The front porch has a white railing and the black numbers "225" appear on one of the posts. The rear of the premise consists of a wheel chair ramp and one purple door with black letters "Lotus Spa" on it. Authority to search is only sought for the business establishment on the first floor of this structure and the basement and not an apartment located on the second floor. The premise is located on the north side of East Avenue between 217 and 229 East Avenue in Lockport, New York (Exhibit C).

d) **Premises 4** is more particularly described as a two story grey sided building with cream colored brick on the first floor front of the building. There is a porch located on the second floor front of the building. Above the front porch there are the black letters "Lotus Spa" on the front of the building. There is a yellow sign containing black letters and numbers "Lotus Spa Accupressure 282-1976" on the north side of the building. The main entrance consists of one glass door covered by a yellow blind with the black letters "Lotus Spa" and black numbers "446" on it. The rear of the premise consists of a wheel chair ramp and one steal type door. There is also a yellow sign containing black letters

and numbers "Lotus Spa Accupressure 282-1976" on the west side or rear of the building. The premise is located on the west side of Third Street with an open lot on the north side of the building in Niagara Falls, New York (Exhibit D).

e) **Premises 5** is more particularly described as a two story brick single family residence. The main entrance consists of two wooden doors. The number "1077" appears in brown on the brick next to the front entrance. The premise is located on Bowen Drive West between 1085 Bowen Drive West and 1084 Bowen Drive East in North Tonawanda, New York (Exhibit E).

f) **Premises 6** is more particularly described as a one story glass window front building with white concrete below the windows and a blue awning above it. There is a yellow sign containing black letters and numbers "Lotus Accupressure 690-9900" above the blue awning of the building. The main entrance consists of one glass door with the numbers "2302" in white on the front door as well as a paper sign containing the letters "Lotus Accupressure." The premise is located on the southern side of the plaza in between 2298 and 2306 Niagara Falls Blvd., Tonawanda, New York. The main entrance is facing Niagara Falls Blvd., Tonawanda, New York (Exhibit F).

9

### III.  **CRIMINAL OFFENSE**

9.    The underlying federal offenses for the Complaint and
search warrants are: (1) a violation of Title 18, United States
Code, Section 371, Conspiracy to Commit an Offense against the
United States; to wit, Title 18, United States Code, Section 2424,
Failing to File a Factual Statement About an Alien; and (2) a
violation of Title 18, United States Code, Sections 2424 and 2,
Failing to File a Factual Statement About an Alien.  In pertinent
part, Title 18, United States Code, Section 2424 requires
"[w]hoever keeps, maintains, controls, supports, or harbors in any
house or place for the purpose of prostitution, or for any other
immoral purpose, any individual, knowing or in reckless disregard
of the fact that the individual is an alien," to file a statement
with relevant immigration authorities[1] certain information,
including the alien's name, address, and facts of entry.  Thus, the
elements of this offense include:

---

[1]  While Section 2424 states that such statement be filed with
the Commissioner of Immigration and Naturalization, since the
creation of the Department of Homeland Security (hereinafter,
"DHS"), the filing would occur with the Director of the Bureau of
Citizenship and Immigration Services (hereinafter, "CIS").  See
Homeland Security Act of 2002, Pub.L.No. 107-296, Sections 402, 441
and 1517 (Nov 25, 2002), codified at 6 U.S.C.A. Sections 202(3),
251 and 557.

a.  keeping, maintaining, controlling, supporting, or harboring an individual in any house or place;

b.  for the purposes of prostitution, or any other immoral purpose;

c.  knowing or in reckless disregard of the fact that said individual is an alien; and

d.  failing to file the required statement concerning the individual within 5 business days of commencing such activity with the relevant immigration authorities.

Notwithstanding the activities occurring in the described premises by the defendants identified herein, a thorough search of all relevant immigration files indicates no such statements have been filed by any of the defendants.

## IV.   OVERVIEW

### A.   Summary of Investigation

10.  As a result of this fifteen month investigation, it was revealed that the defendants conspired to own and operate four brothels in the Buffalo area utilizing alien individuals to commit acts of prostitution. The businesses, alleged to be "acupressure"

11

businesses in reality were fronts for prostitution.[2]   The prostitutes utilized in the brothels were of Asian descent.   The Asian females are aliens, some in the United States legally and some illegally.   The defendants maintained and harbored the Asian prostitutes in locations they either owned or rented.   The prostitutes lived at the locations and the defendants provided food and other miscellaneous supplies to the prostitutes.   Further investigation revealed that no notifications were made to the Director for US Citizenship and Immigration Services reporting the presence of the aliens.

**B.     Initiation of Investigation**

11.   This investigation was initiated in September, 2006 by the FBI and United States Border Patrol after it was brought to the attention of the FBI that an acupressure business located at 3571 Niagara Falls Boulevard, Wheatfield, New York may be operating as a front for prostitution.   Subsequent surveillance corroborated this allegation and an investigation began which revealed that the above named defendants owned and operated four acupressure businesses acting as fronts for prostitution.

---

[2]   The names of the described premises, and advertisements and signage, have changed slightly in the course of the investigation and have used various spellings of accupressure.

C.   **Information Learned Prior to Wire Interception**

12.   During the course of the investigation, it was discovered that between December, 2003 and November, 2006, CHONG and K. CHONG utilized credit cards in their names to purchase approximately one hundred airline tickets for Asian females believed to be prostitutes who worked for them at their brothels.

13.   Surveillance conducted of the defendants during the investigation revealed CHONG, TSUI and K. CHONG travel from their residence to the brothels.   Surveillance conducted at the brothels revealed male customers entering the locations, often times with the males parking far away from the brothels and walking to the location.

14.   A Confidential Source who has proven accurate and reliable on multiple occasions assisted in the investigation and was sent into one of the brothels to gather information.   Upon debriefing afterward, he reported that he was offered sexual intercourse for sixty dollars by one of the girls inside the premises.   Trash retrievals revealed used condoms for two of the locations on several occasions.   Pen register information revealed numerous telephone calls to Asian females believed to be the prostitutes who came to work for the defendants.   Pen register

13

information further revealed hundreds of calls between defendants'
cellular and home telephones to the brothels.

15.   CCTV surveillance at one of the brothels revealed CHONG,
TSUI and K. CHONG frequently arriving and departing as well as
transporting females to and from the brothel.   The defendants were
also observed dropping off food and other supplies to the brothel.
The CCTV revealed that the prostitutes were living at the brothel
as they did not appear to leave at night or arrive in the morning.

D.   **Information Learned During the Wire Interception**

16. Court ordered wire intercepts were obtained for three
telephones in this investigation beginning in August, 2007 and
continuing into November, 2007.   The lines which were intercepted
were the cellular telephone of CHONG, the residence telephone at
**Premises 4** (1077 Bowen Drive West, North Tonawanda) and the
cellular telephone of K. CHONG.   Wire intercepts revealed the
defendants    utilized    these    telephones    to    coordinate    the
transportation of prostitutes to and from Buffalo to work in their
brothels.   The telephones were also utilized to coordinate the day
to day operation of the brothels.   A selection of calls supporting

14

the charges in this complaint and the above requested search
warrants are summarized below.[3]

## V.   PROBABLE CAUSE

### A. Premises

### Golden Accupressure, 3571 Niagara Falls Boulevard, #14, Wheatfield, New York (Premises 1)

17.   Based on the investigation to date, I believe Len Wah
CHONG operates Golden Accupressure, 3571 Niagara Falls Blvd., #14,
Wheatfield, New York.   CHONG frequently meets with customers,
prostitutes and other business associates at **Premises 1** to discuss
the illegal prostitution business.   Surveillance has observed Len
Wah CHONG enter and exit the business.   The examination of
discarded trash (trash searches) from **Premises 1** has revealed
evidence of prostitution; to wit, used condoms and condom wrappers

---

[3]  It should be noted that the primary language spoken by the
interceptees was Mandarin Chinese.   Contract linguists monitored
the interceptions and translated the calls into English.   Your
affiant then reviewed these translations and thus, unless indicated
otherwise in this affidavit, the report of each call is based upon
your affiant's review of the linguists' translation.   Care is taken
to distinguish between what was said in the intercepted
conversation and your affiant's interpretation of this conversation
based upon my training and experience in these types of cases, as
described supra.

15

were discovered.   The following Title III intercepts partially
illustrate the knowledge Len Wah CHONG has about the illegal
activities occurring inside Golden Accupressure.

18.   On August 12, 2007, CHONG placed a telephone call to
**Premises 1**.  CHONG spoke to an Asian female named Chun BATES, a/k/a
"Lala"[4] concerning recent complaints CHONG had received by some
customers pertaining to the girls soliciting tips from them.  CHONG
stated she didn't care if there were any girls working in the
store; she just wants to live safely and peacefully.  CHONG stated
three of the customers have called 7 or 8 times already to
complain.  CHONG told "Lala" she would not protect the girls if the
police show up and will allow the police arrest all of the girls.

19.   On August 23, 2007, CHONG placed a telephone call to
**Premises 1**.  CHONG told an unknown Asian female (UAF) the "police
captain" is on his way to **Premises 1**.  She instructed the UAF to
give him a 45 minute service and wanted to know whose turn it was
in the rotation.  The UAF told CHONG it was an Asian female whom
CHONG referred to as "Lala's" turn.  CHONG told the UAF the "police

---

[4]   All references in the affidavit to women as aliens, in
which the woman is identified by name, are a result of the
individual's name having been run in DHS records and it revealing
that such women are aliens.   The use of the term prostitute or
brothel in your affiant's description of a person or place is based
on the totality of the evidence described in the affidavit.

captain" does not count in the rotation.  It should be noted the "police captain" was coming from **Premises 5.**

20.  On August 24, 2007, CHONG received a telephone call from **Premises 1.**  An Asian female whom CHONG referred to as "Jenny" told her the propane tank is out of gas and they are unable to cook their food.  It should be noted in human trafficking cases, victims are required to cook in the locations where they conduct the prostitution to limit their movement away from the premises and thus maintain greater control over them.  They use hot plates fueled by combustible gas charged canisters which are not designed to be used indoors.  Some of these canisters have been recovered in the trash from **Premises 1.**

21.  On September 4, 2007, CHONG made a telephone call to **Premises 1** and spoke to an Asian prostitute named Zhe She XU, a/k/a Jenny.  XU complained to CHONG that she put someone there who doesn't work and always asks for tips and refuses to do full sets (sexual intercourse) that is driving customers away.  XU told CHONG that men don't care about the quality of the girls if it's just "half sets," but for "full sets," she wants younger girls.  CHONG told Jenny not to talk about this on the phone.  Based on your affiant's background and experience as related in paragraph 2-5, supra,  and on the current investigation (which has included

17

interviews with two women who have worked for, or are working for,
CHONG as prostitutes), "full sets" refers to sexual intercourse and
"half-sets" can be used to refer to either oral sex or hand-jobs
(that is, anything less than intercourse).   Other terms used are
"mouth" or "oral," both meaning oral sex.

22.   On September 05, 2007, CHONG placed a telephone call to
**Premises 1.**   CHONG told an Asian female whom CHONG referred to as
"Jenny" the "Police Captain" was on his way to **Premises 1.**   CHONG
told "Jenny" the "Police Captain" just visited her husband and his
service will not be counted on the normal rotation.

23.   On September 06, 2007, CHONG placed a telephone call to
**Premises 1.**   CHONG told an Asian female whom CHONG referred to as
"Jenny" the "Judge" was on his way to **Premises 1.**   CHONG told
"Jenny" to only charge him for one hour even though he wanted a one
and half hour service.

24. On September 06, 2007, CHONG placed a telephone call to
**Premises 1.**   CHONG told an Asian female whom CHONG referred to as
"Jenny" the girls make almost the same amount of money working in
an apartment as they do working in her brothels.   CHONG told
"Jenny" if a girl works in an apartment they rotate girls every
twenty days and switch apartments every two to three months.   CHONG

told her that some brothels charge customers $100 in which the boss takes $30 and the girl gets $70. CHONG told "Jenny" business will not be busy the next couple of days due to police raids of brothels in Rochester, NY. CHONG told "Jenny" not to worry because all of her girls have "green cards" and or legal identification.

25. On September 25, 2007, CHONG received a telephone call from **Premises 1**. CHONG told Boksun SAYLES to instruct an Asian female whom CHONG referred to as "Jenny" to stop cooking inside the building. CHONG stated "Jenny" needs to cook outside of the building because the owner and some customers have complained. CHONG is worried about receiving a letter from the government concerning the cooking issue. SAYLES complained to CHONG she made no money because there are six girls working at **Premises 1**. CHONG then told "Jenny" directly to stop cooking inside the building. "Jenny" told CHONG that the girls have had nothing to eat all day and are complaining.

26. On September 29, 2007, CHONG placed a telephone call to **Premises 1**. CHONG told an Asian female whom she referred to as "Jenny" she tried to collect an Asian female whom CHONG referred to as "PING PING'S" debt. CHONG stated her husband's medical bills are over $300,000 and the hospital is trying to collect from them. CHONG stated she already paid the hospital $60,000. CHONG stated

an Asian female whom she referred to as "KIKI" also owed her money, but she was bringing it to her on October 15.   CHONG stated a different "Jenny" owed her $8,000 and an Asian female whom she referred to as "AMY" owed her $25,000.   CHONG further stated the boyfriend of an Asian female whom she referred to as "CICI" wanted to make monthly payments of $1,000 to her.   CHONG expressed her frustration over the monthly payments since "CICI" could make over $10,000 a month.

27.   On October 1, 2007, CHONG made a telephone call to **Premises 1**.   CHONG spoke to XU and told her to listen carefully. CHONG said they are on action (or alert), the government won't give girls tips intentionally.   CHONG told XU she just got back from seeing the Sheriff because he was looking for her.   CHONG told XU that law enforcement is intentionally not giving tips to the girls to see their reactions.   CHONG further stated that this was happening nationwide.   CHONG said she was going to call Lotus.

28.   On October 2, 2007, CHONG made a telephone call to **Premises 1**.   CHONG complained to XU that all the bad customers came together today.   CHONG instructed XU not to talk about this on the telephone or in front of the girls.   XU said the girl is complaining about only getting twenty or thirty dollars for a full

set (sexual intercourse).  CHONG told XU she will pick up that new girl tomorrow.

29.   On October 2, 2007, CHONG placed a telephone call to **Premises 1**.  CHONG told an Asian female whom she referred to as "Jenny" to inform the new girl her store only does half sets and not full sets.  "Jenny" asked CHONG why she told the new girl her store does full sets.  CHONG raised her voice and told "Jenny" her store only does half sets.

30.   On October 09, 2007, CHONG received a telephone call from **Premises 1**.  An Asian female referred to by CHONG as "Jenny" told CHONG a customer was in the brothel and wanted to charge the insurance company for his massage because he was involved in a motorcycle accident.  CHONG advised the customer she cannot charge the insurance company and refused to service him.  This call is an indication CHONG does not want her businesses involved with legitimate businesses such as insurance companies.

31.   On October 16, 2007, CHONG placed a telephone call to **Premises 1**.  CHONG told an unknown Asian female (UAF) the "Judge" called and could not make it to **Premises 1** that day.  CHONG told the UAF that Xiu LIN aka "COCO" went to New York City and told everyone if you get arrested in Buffalo, NY, you can get legal

21

immigration status.  CHONG told the UAF the "Judge" was also upset
with LIN due to her conversations in New York City about obtaining
legal immigration status after being arrested in Buffalo, NY.
CHONG stated the "Judge" advised her to have people from a church
provide the girls with a letter in order to help their immigration
status.  CHONG stated this topic was the talk of the town in
Flushing, NY due to LIN'S comments.


    32.  On October 17, 2007, CHONG placed a telephone call to
**Premises 1.**  An unknown Asian female (UAF) told CHONG a customer
did not pay the tip so she would not let him go.  CHONG told the
UAF that same customer already "hit" two girls at **Premises 3**
because he took drugs.  CHONG told the unknown male customer he was
with the girls for two hours and he needed to take care of the
girls.  He stated he would only pay an Asian female whom CHONG
referred to as "Lala" because the new girl didn't measure up.
CHONG advised him to never come back to the brothel.  CHONG told
the UAF this is the customer who did an Asian female whom she
referred to "Jenny" for four hours and did not pay her either.


    33.  On November 01, 2007, CHONG placed a telephone call to
**Premises 1.**  CHONG told an unknown Asian female whom she referred
to as "Jenny" that the government was going to seize all of her
properties.  CHONG said this is due to her husband's medical bills

being in the hundreds of thousands of dollars.   CHONG told "Jenny"
she is very upset the Lockport property (**Premises 3**) was discovered
by the hospital.   CHONG told "Jenny" she is upset with her husband
for not transferring the title into her brother's name.

34.   On November 02, 2007, CHONG placed a telephone call to
**Premises 1**.   CHONG told an unknown Asian female whom she referred
to as "Jenny" that James LEWIS just lost $5,000 that belonged to
her.   CHONG said that LEWIS was supposed to change chips to cash at
the casino because she couldn't do it because it's too much money
and she doesn't want the attention.   LEWIS instead of cashing in
the chips gambled and lost it all.   This call is evidence of CHONG
using the casinos to launder proceeds of the illegal activities at
her brothels.

35.   On November 3, 2007, CHONG made a telephone call to
**Premises 1**.   CHONG told XU that "Da Quan" called her and informed
her that a shop in Buffalo got raided and one girl without legal
status was detained and the two who were released are Da Quan's
friends.   CHONG asked XU to instruct the girls to be careful and
not to offend the customers.   CHONG told XU when the Sheriff
arrived later he reminded the girls to be cautious and not to ask
for tips.   CHONG then spoke to an Asian prostitute named Xiu LIN,
a/k/a Coco, and told her a shop in Buffalo got raided by the police

23

and the Immigration office yesterday morning.  Coco is known to be an Asian prostitute as the result of another investigation with which your affiant is familiar, which included self-admission of same by Coco.

**LUCKY  J  FORTUNE  TELLER,  3571  NIAGARA  FALLS  BLVD.,  #13, WHEATFIELD,  NEW YORK** (Premises 2)

36. Based on the investigation to date, it is believed that Len Wah CHONG leases the premises known as Lucky J Fortune Teller, 3571 Niagara Falls Blvd., #13, Wheatfield, New York.   It is believed that CHONG uses **Premises 2** as a place for the illegal alien Asian females to reside while not working as prostitutes. Physical surveillance in the course of the investigation and the use of pole cameras have shown that no customers enter either the front door or rear door of **Premises 2**.  The use of pole cameras has also shown CHONG and numerous prostitutes frequently going from the rear door of Golden Accupressure and the rear door of **Premises 2**. It is further believed that CHONG uses **Premises 2** to launder proceeds she obtains from her prostitution business in an effort to legitimize the money  as this is a common practice when offenders own businesses in name only, that is, businesses that are not operational.

24

37. **Premises 2** appears to be a business that is open, when in fact surveillances have revealed no evidence of any legitimate business occurring at **Premises 2.** Telephone number (716) 695-0088 listed on the front of the business is no longer in service and there is no other information concerning this number. **Premises 2** appears to be a front for the prostitution business occurring next door at Golden Accupressure **(Premises 1).**

38. Pole camera video has shown CHONG entering the rear door of **Premises 2** with a customer and business associates of CHONG'S. Based on intercepted telephone communications between CHONG and this individual, it appears CHONG may use this location as a meeting place to discuss business that she doesn't want the prostitutes to hear. Further video shows furniture, what appear to be beds, and dressers being taken into **Premises 2.** With the presence of bedroom furniture inside and with the prostitutes walking between these locations, it is reasonable to conclude that the prostitutes are using **Premises 1** to sleep when not working at **Premises 2.**

39. Information received from the former prostitute referenced in paragraph 54, infra indicates that **Premises 2** is being used to facilitate prostitution. She has stated there is an inside door between **Premises 1** and **Premises 2** that leads to more

25

rooms where prostitution is occurs and that these rooms are used for special or VIP customers.

40.  M&T Bank records show that the rent for **Premises 2** was paid for by Golden Accupressure (**Premises 1**) company checks numbered 455, 467, 475, 482, 491, and 501.  The dates of these checks were as follows: 11/29/04, 01/01/05, 02/01/05, 03/01/05, 04/01/05, and 05/01/05.  HSBC Bank records show that the rent for **Premises 2** switched to Jade Fortune INC, 3571 Niagara Falls Blvd., #13, Wheatfield, NY 14120 (Same address used as **Premises 2**) company checks numbered 1008, 1024, and 1030.  The dates of these checks were as follows: 06/01/05, 06/30/05, and 08/31/05.

## Lotus Accupressure Spa, 225 East Avenue, LOWER, Lockport, New York (Premises 3)

41.  Based on the investigation to date, it is believed that Len Wah CHONG owns the building at, and operates, Lotus Accupressure Spa, 225 East Avenue, Lower, Lockport, New York.  It is believed that CHONG frequently meets with customers, prostitutes and other business associates at **Premises 3** to discuss the illegal prostitution business.  Surveillance has observed Len Wah CHONG enter and exit the business.  The following Title III intercepts

26

partially illustrate the knowledge Len Wah CHONG has about the illegal activities occurring inside Lotus Accupressure Spa.

42. Len Wah CHONG contacted **Premises 3** on seven different occasions requesting the business money to be ready for her to pick up.

43. On August 9, 2007, CHONG made a telephone call to **Premises 3**. CHONG spoke to a prostitute named Mary about the incident with the customer. CHONG told Mary that he is very tricky and that Mary should not do full service set (sexual intercourse) for him the next time. CHONG told Mary that no refund should be offered when the client leaves early. CHONG told Mary that this customer used to come to look for Jenny and Angel, and that he sometimes spent three hours in the store and his friend has even spent four hours.

44. On August 16, 2007, CHONG placed a telephone call to **Premises 3**. CHONG spoke to an Asian female whom she called "Mary" and told her not to ask the customers for tips because customers that used to go to **Premises 3** are now going back to **Premises 1**. CHONG advised "Mary" how to dress for the customers and to lie to the customers about how many girls work at that location. CHONG stated she can see everything that happens at her brothels on her

computer. This indicates CHONG may have cameras installed at each brothel which she can monitor at **Premises 5** or she could just be bluffing her employees to exert and maintain control.

45.   On August 20, 2007, CHONG placed a telephone call to **Premises 3**. An Asian female whom CHONG called "Mary" told CHONG she had two bad paying customers and that she thought one of them may be a police officer. CHONG told "Mary" the customer was not a police officer, but he was a known customer to CHONG. "Mary" told CHONG she only received a $20 tip from this man and CHONG told her not to talk about these types of things over the telephone.

46.   On September 5, 2007, CHONG made a telephone call to **Premises 3**. CHONG spoke to a prostitute named Amy and told her that customers who are friends of the Judge called her to complain about Mary. CHONG told Amy she was at Golden and that Judge told her Lockport is a high class spot, and that girls should not solicit for tips and if they do, he (the Judge) will not help her out. Amy told CHONG she was aware of this. CHONG added that the Judge informed her Mary offended every customer. CHONG said she told the Judge she fired Mary and that the Judge agreed with CHONG's actions and commented that if she had not fired Mary, she would have made trouble. CHONG advised Amy she should do a good job.

47. On September 17, 2007, CHONG made a telephone call to Premises 3. CHONG spoke to an unidentified prostitute she called Mei Mei. CHONG instructed Mei Mei how to take off and put on the customers' clothes, including socks. CHONG told Mei Mei that her customers are not really here for massages. Mei Mei mentioned a customer to CHONG who was a good one because he gave her a sixty dollar tip for "mouth" (oral sex).

48. On September 20, 2007, CHONG placed a telephone call to Premises 3. CHONG advised an Asian female whom she called "Gina" that in order to work in this field, she'll have to get used to it and have a balanced state-of-mind. CHONG told "Gina" she was going to open a pure massage parlor and "Gina" told her that she would like to only do pure massage. "Gina" stated she wanted to better her English and massage techniques. "Gina" commented on the low quality of her customers at Premises 3 and that if they were not customers she would beat them to death. "Gina" further stated she never risk her "green card" status.

49. On September 23, 2007, CHONG made a telephone call to Premises 3 and spoke to an unidentified prostitute she called Linda. Linda told CHONG she did five customers yesterday. CHONG told Linda it is okay to receive repeat customers after hours. Linda said he took out one hundred dollars and asked for half an

29

hour of service.  Linda said she did not have any money to give him change because Lisa comes every day to take the cash away.  Linda asked the customer if she could give him the change later.  The customer said that was fine.  Linda commented to CHONG that the customer was a bastard because he only paid her fifty dollars after asking her for everything (sexual intercourse).  CHONG criticized the customer too but advised Linda not to say such things over the phone.

50.  On September 24, 2007, CHONG placed a telephone call to **Premises 3**.  CHONG informed an Asian female whom she called "Linda" her calculation was wrong.  "Linda" should have given CHONG $340 plus $25 totaling $365.  Instead, CHONG told "Linda" she subtracted $25 from $340 and gave her $315.  CHONG told "Linda" she is short $50 and "Linda" agreed then apologized.  CHONG told "Linda" to slow down with the customers and try to keep their business.

51.  On September 28, 2007, CHONG made a telephone call to **Premises 3** and spoke to a prostitute named Linda.  CHONG told Linda not to be scared and that she will learn from experience.  CHONG told Linda there is nothing to worry about in her store.  Linda told CHONG she gets scared when there are two together.  CHONG said there is nothing to be worried about for pure massage and that CHONG has approval from the government.  Linda told CHONG she hid

all of the condoms and some other things a while ago.  CHONG told

Linda not to talk about this on the phone.

52.  On October 02, 2007, CHONG placed a telephone call to
**Premises 3**.  "Linda" advised CHONG she had six customers that day.
CHONG told her that she wanted her to come back to work for her
when she returns to Buffalo, NY.  "Linda" apologized to CHONG not
counting the money correctly.  CHONG advised her that she has not
calculated the money yet.  "Linda" also told CHONG she and the
other girl still have not paid the house fee of $25 per day to
CHONG because they forgot.  CHONG advised her that she will
calculate it the following day.

53.  On October 11, 2007, CHONG placed a telephone call to
**Premises 3**.  An unknown Asian female advised CHONG she did 4
customers one of who was a kid that used a credit card and charged
$30.  CHONG advised her that she should have asked CHONG first
because the service fee is $5 for using a credit card.  CHONG told
the unknown Asian female the other stores were caught because they
used credit cards and the girls cannot charge tips to a credit
card.

54.  In the course of the investigation, a former prostitute of
CHONG'S has been debriefed regarding her activities at **Premises 3**.

31

She indicated that **Premises 3** is being used to facilitate prostitution and that she participated in prostitution at this location, and that she used **Premises 3** as a residence while working for CHONG.   Information from this former prostitute has been independently corroborated where possible by your affiant and others and she is believed to be accurate and reliable.

### Lotus Spa, 446 Third Avenue, Niagara Falls, New York (Premises 4)

55.  Based on the investigation to date, it is believed that Len Wah CHONG owns the building at, and operates, Lotus Spa, 446 Third Avenue, Niagara Falls, New York.   The following Title III intercepts partially illustrate the knowledge Len Wah CHONG has about the illegal activities occurring inside Lotus Spa.

56.  On August 9, 2007, CHONG placed a telephone call to **Premises 4**.  CHONG talked to Feng Xian LI about a $50,000 house for sale.   CHONG wanted her to buy this house using her credit information.   CHONG told her this house was on auction by the Seneca Niagara Casino and she can obtain it for less money by going through the back door with the casino.   CHONG and Feng Xian LI then discussed the brothel business and how CHONG only allows "hand work" (hand jobs) and or "half sets" (oral sex) in her business. CHONG advised Feng Xian LI when she started the business as a

32

prostitute, she would never get emotional with any customers even though they offered to buy her an apartment or offered to take care of her financially.

57.   On August 13, 2007, CHONG received a call to **Premises 4.** Feng Xian LI told CHONG a man named Rick LNU (Last Name Unknown) is at **Premises 4** and wanted to talk to CHONG.   CHONG told Feng Xian LI, a/k/a "Annie" to offer a massage to Rick LNU without charging him the house fee.   Rick LNU advised CHONG he will wait at **Premises 4** for CHONG to arrive.

58.   On August 20, 2007, CHONG placed a call to **Premises 4.** CHONG told Feng Xian LI other massage parlors offer half hour service for $30 and $60 for "full service."   CHONG complained that Feng Xian LI charges $65 for a "half set" massage.   CHONG stated she doesn't want to run an ad because safety is first.   CHONG believes the prior arrests by Immigration and Customs Enforcement were a result of the advertisements each brothel placed in the Artvoice newspaper.   CHONG told her a lot of her customers are police officers and public officials.

59.   On August 20, 2007, CHONG placed a call to **Premises 4.** CHONG asked Feng Xian LI if she knew the girl who used to work at the store located on Main Street.   This girl provides massage while

33

completely nude and offers "full set" service for $50 to $60.
CHONG said the boss gets $60 and the girl gets $100.   CHONG stated
she will run an ad for **Premises 4** and asked Feng Xian LI to be
careful and don't demand tips from the customers.

60.   On August 20, 2007, CHONG made a telephone call to
**Premises 4**.  CHONG spoke to Feng Xian LI, who told CHONG that there
was no business today.  LI suggested that they should put an
advertisement in the Artvoice.  CHONG told LI that at some of the
other parlors they are offering half hour service for thirty
dollars and that for sixty dollars, the client can get full
service(sexual intercourse).  CHONG told LI that the other parlors
are  affecting her business and has caused her to lose some
customers.   CHONG told LI she is not against placing an
advertisement but that they should put safety first.  CHONG said
that word of mouth is the most important.

61.   On August 21, 2007, CHONG placed a call to **Premises 4**.
CHONG asked Feng Xian LI if she gave her the $42 from the ½ hour
customer from the day before.  Feng Xian LI told CHONG she put
everything together and it was included in the $130.  CHONG stated
Feng Xian LI always makes each fee an envelope, so she got confused
when there was only one envelope from the day before.

34

62.   On August 26, 2007, CHONG placed a call to **Premises 4**.
CHONG told Feng Xian LI she turned on her computer and found out
that James LEWIS was lingering around her spa.   CHONG told LI she
yelled at LEWIS about lingering in and around her spa.   This call
indicates possible surveillance equipment located inside **Premises
4**, as well as, a computer used to monitor these activities located
in **Premises 5**.

63.   On September 1, 2007, CHONG made a telephone call to
**Premises 4**.   CHONG spoke to LI who asked CHONG to drop the
advertisement starting this week because it is dangerous.   CHONG
told LI she warned them beforehand about the risk.   CHONG told LI
that her friend the "Sheriff" went to CHONG's home to visit TSUI
and he advised CHONG not to run the advertisement because operating
two more parlors is dangerous.   CHONG asked LI if she received any
information from her guy from the immigration agency.   LI said she
had not.   CHONG asked LI if she was told about this from other cops
and LI said she was.   LI said she was told by a cop that they
should not run the advertisement and be careful.   CHONG told LI she
would drop the advertisement this week.

64.   On September 2, 2007, CHONG placed a call to **Premises 4**.
CHONG stated that Ying LUAN said "when I pay you back all the
money, I don't want to work anymore."   CHONG and Feng Xian LI

agreed that would be fine.    CHONG stated Ying LUAN used an "old
man" to help her with her immigration paperwork and that she
tricked him.   CHONG stated if Ying LUAN was to go work for the "old
man," then when she wanted to leave he would not let her go.


65.   On September 5, 2007, CHONG received a call to **Premises
4**.  Feng Xian LI told CHONG she was considering bringing her son to
the United States from China.   Feng Xian LI said her divorce papers
were filed but she is unsure if she can bring her son over.   CHONG
told Feng Xian LI to ask her regular customer, who is an INS
officer, to help her bring her son to the U.S.   Feng Xian LI said
she should provide the INS officer a "full set" if she is going to
ask him for his assistance.   CHONG stated she has a friend that
knows this officer and he is scared about being caught since one of
his friends was caught and fired.


66.   On October 09, 2007, CHONG placed a call to **Premises 4**.
CHONG and Feng Xian LI discussed the recent government inspection
of other massage parlors in the area.   The government inspectors
checked their registration and the owner's license during the
inspection,  and  she  heard  that  all  the  girls  ran  from  the
locations.

67.   On October 11, 2007, CHONG placed a call to **Premises 4**. CHONG asked Ying LUAN if she was interested in purchasing land for less then $40,000.   CHONG told Ying LUAN there were six people involved in the purchase and that CHONG has money but it is under her sister in law's name.

68.   On October 19, 2007, CHONG received a telephone call from LI at **Premises 4**.  CHONG told LI to take her time and work.  CHONG told LI that Yoyo has such bad luck.   CHONG said she just left Lockport and that Yoyo had two customers, both were "big" (sexual intercourse).   CHONG said that no customer wants Yoyo (apparently a reference to Yoyo having previously worked at **Premises 4**).   LI said that she should just do as many as she can.

69.   On October 21, 2007, CHONG placed a call to **Premises 4**. CHONG told Feng Xian LI the "Judge" is mad at Xiu LIN because she was talking too much lately concerning her situation.  Xiu LIN is a victim / material witness in an ICE investigation which was taken down in March 2007 in Buffalo, New York.  CHONG stated that Xiu LIN told a lot of people that if you come to Buffalo, NY, you can get arrested and obtain legal immigration status.  CHONG also stated another government agency is contacting the "Judge" now.

37

70. On October 27, 2007, CHONG placed a call to **Premises 4.**
CHONG asked Feng Xian LI if she could write her checks made out to
cash.   LI told CHONG she doesn't have a checking account.   CHONG
asked LI how she paid for the property she just purchased.   LI
advised CHONG she paid cash for the property.   CHONG told LI not to
make such big purchases in cash so no reports have to be done.

### 1077 BOWEN DRIVE WEST, NORTH TONAWANDA, NEW YORK
### (Premises 5)

71. Based on the investigation to date, it is believed that
Len Wah CHONG owns 1077 Bowen Drive West, North Tonawanda, New
York.   As related supra, all four defendants live at the Bowen
Drive residence, thus many of the calls related herein are to or
from **Premises 5** and involve more than one defendant.   It is
believed that CHONG frequently uses this residence to contact
customers, prostitutes and other business associates to discuss the
illegal prostitution business. If is further believed that CHONG
uses **Premises 5** to store large amounts of U.S. currency that she
obtains from her prostitution business in an effort to circumvent
the IRS by not reporting her earned income correctly. Surveillance
has observed Len Wah CHONG enter and exit the residence.
Surveillance further revealed a meeting between a customer/handyman
and one of the prostitute's.   It is believed that this meeting was
held to facilitate an illegal marriage between them in an attempt

to gain immigration status for the illegal Asian female prostitute. The following intercepted calls are intended to serve as an example of how CHONG utilizes her residence to manage and control the brothels, and her employees.

72.   On August 6, 2007, CHONG made a telephone call to **Premises 4**.   CHONG told LI that she turned on her computer and found out that Jimmy was lingering around the spa.   CHONG is believed to have a computer at **Premises 5**.

73.   On August 8, 2007, CHONG made a telephone to **Premises 4** and spoke to an Asian prostitute believed to be Ying LUAN, a/k/a Yoyo.   CHONG told Yoyo, "I am waiting for Annie. Right? I told Annie to exchange money for me.  I brought some money with me".

74. On August 14, 2007, CHONG placed a call to **Premises 5**. CHONG told Kim Poh CHONG to go to **Premises 1** because the credit card machine is not working properly.  This is an indication that K. CHONG assists in the operation of the brothels and has been present in them (this particular call of course relates to Golden Accupressure only).

75.   On August 17, 2007, CHONG using the target telephone placed a call to **Premises 5**.   CHONG told Kim Poh CHONG that Feng Xian LI wanted to buy property and put it in CHONG'S name because LI'S credit was not that good.   Kim Poh CHONG told CHONG that LI could put a higher down payment but advised her not to participate in this transaction.   In this call, CHONG is referring to a prostitute in one of her brothels to K. CHONG in a way which would indicate K. CHONG'S familiarity with the prostitute.

76.   On August 19, 2007, CHONG placed a call to **Premises 5**. CHONG asked Kim Poh CHONG to bring groceries to **Premises 6** and collect the money as well.   This call once again illustrates K. CHONG'S assistance in the operation of the brothels, specifically that the girls working there also live there and need groceries brought to them (not having their own mobility).   He is also being entrusted with the handling of the proceeds of the activities at the brothel.

77.   On September 11, 2007, CHONG called her residence (**Premises 5**) and spoke to "Bridget".   CHONG told Bridget to call her father and remind him to go to "Lotus" and do the accounts.

78.   On September 13, 2007, CHONG called her residence and spoke to Wei ZHANG.   CHONG told Wei ZHANG to buy an airline ticket

to Texas for Degui ZHANG, a/k/a "Helen," who is heading to court and to use the credit card.  CHONG said Helen will pay Wei ZHANG back with cash.  This call supports the belief that Wei ZHANG assisted in the activities of CHONG, in this instance, the transportation of Helen, one of the brothel's prostitutes, to a Court appearance out-of-state.

79. On September 17, 2007, CHONG placed a call to **Premises 5.** CHONG told Wei ZHANG the traffic was bad and she has not collected the money from the girls yet.  CHONG told ZHANG she went to her store and an unknown Asian female whom she referred to as "LILY" did not have the money ready to be picked up.  "LILY" will have two days worth of money ready for collection the following day.

80. On October 3, 2007, CHONG spoke to Rulisa and told her she wanted to open a legitimate massage parlor.  CHONG told her she cannot put it in her name and would like to put it in Rulisa's name because CHONG has too many stores already.  CHONG stated she was afraid the government might investigate her because she has too many locations.  Rulisa told CHONG she has to think about it.

81. On October 4, 2007, CHONG told Wei ZHANG the business at **Premises 6** was very good, they had 11 customers yesterday.  CHONG told ZHANG to take some of the money for herself.  This call

41

indicates ZHANG shared in the proceeds of the brothel's illegal activities.

82.   On October 08, 2007, CHONG placed a call from **Premises 5** to 626-758-2761.   CHONG asked an Asian female whom she referred to as "Yusa" if she was able to refer her any girls to work at her brothels.   "Yusa" advised CHONG she heard from a friend Buffalo is not a safe place to because she believed the police are watching these locations.   "Yusa" told CHONG even though she has never met CHONG, she heard all nice things about her.   "Yusa" heard all of CHONG'S places are very safe to work and four rooms can bring in over $10,000.   CHONG told her not to talk about this over the telephone.

83.   On October 13, 2007, CHONG placed a call to **Premises 5**. CHONG asked Wei ZHANG where she went because she wanted her to come out of **Premises 5** and get the money from her.

84.   On October 15, 2007, CHONG placed a call from **Premises 5** to 646-400-8475.   CHONG told an Asian female who she referred to as "Eva" how to file her taxes and the "green card" application. CHONG stated all the girls she hired from California are originally from Tian Jing.

85.  On October 15, 2007, CHONG made a telephone call to
**Premises 3** and spoke to an unidentified Asian prostitute.  CHONG
said she was not happy with Helen because she upset customers.
CHONG said that she used the computer, she knew.

86.  On October 17, 2007, Wei ZHANG placed a call from
**Premises 5** to CHONG.  CHONG reminded ZHANG her money was located
inside the "rice box."  This call indicates CHONG is willing to
share with ZHANG the location where she hides her money.

87.  On October 18, 2007, CHONG placed a call from **Premises 5**
to **Premises 1**.  CHONG told an Asian female whom she referred to as
"Jenny" the "Judge" and his friends will be going to **Premises 1**.
CHONG told "Jenny" some of them wanted sex and they were to be
treated as good customers no matter what.  "Jenny" told CHONG she
will tell the other girls what needs to be done.

88.  On October 22, 2007, CHONG made a telephone call to LIN
and told LIN that Ling Ling let customers go.  The customer said
that she will do one hundred dollar customers but not forty or
sixty dollar ones.  LIN told CHONG that Lala was upset about it
too.  CHONG said that the sister-in-law (ZHANG) turned on the
computer and found out about it.

43

89.   On October 22, 2007, CHONG placed a call from **Premises 5** to 917-353-2896.  Xiu LIN told CHONG she is very happy with her new job at the Marriott Hotel in Amherst, NY.   CHONG told LIN she planned on opening a legitimate massage business soon and wanted LIN to manage the business.  CHONG stated the parlor is surrounded by law offices as well as doctors' offices.

90.   On November 2, 2007, CHONG made a telephone call to **Premises 1** and spoke to XU.  CHONG was upset and told XU that Jimmy lost the five thousand dollars she (CHONG) gave to him to change from chips to cash.   CHONG was supposed to change the money, but she could not get in because it's to much and would draw attention.  This call is a good indicator of how CHONG uses the casinos to launder the proceeds from her brothels.

91. On November 3, 2007, CHONG received a call from an Asian prostitute named Lily who asked CHONG if she needs money changed at the casino, she can help.  CHONG told Lily that it was all gone.

92.   On November 7, 2007, CHONG told Wei ZHANG to cancel the ticket they bought for Degui ZHANG, a/k/a "Helen" (this is the former prostitute referenced in paragraphs 39 and 54, <u>infra</u>).  CHONG canceled this ticket because Degui ZHANG was arrested by the United States Border Patrol.

44

**Lotus Accupressure, 2302 Niagara Falls Boulevard**
**Tonawanda, New York** (Premises 6)

93.    Based on the investigation to date, it is believed that
Kim Poh CHONG owns and operates Lotus Accupressure, 2302 Niagara
Falls Blvd., Tonawanda, New York.   It is believed that CHONG and
his   sister   Len   Wah   CHONG   frequently   meet   with   customers,
prostitutes and other business associates at **Premises 6** to discuss
the illegal prostitution business.   Surveillance has observed Kim
Poh CHONG and Len Wah CHONG enter and exit the business.   The
examination of discarded trash (trash searches) from **Premises 6,**
which was taken and discarded in the dumpster behind **Premises 1,**
has revealed evidence of prostitution to wit: used condoms and
condom   wrappers   were   discovered.    The   following   Title   III
intercepts illustrate the knowledge that Kim Poh CHONG and Len Wah
CHONG have about the illegal activities occurring inside Lotus
Accupressure.

94.    Len  Wah  CHONG  contacted  **Premises 6**  on  twenty  three
different occasions requesting the business money be ready for her
to pick up.

95.    On August 13, 2007, CHONG made a telephone call to
**Premises 6** and spoke to her brother, K. CHONG.   CHONG told K. CHONG

she heard one of the three stores has been raided by the police. CHONG told K. CHONG she is scared. K. CHONG said they have to watch out for themselves. This call clearly illustrates that K. CHONG is aware the activities at the brothels involves illegal conduct (otherwise there would be nothing to be scared of when police raids are mentioned).

96. On August 16, 2007, CHONG made a telephone call to **Premises 6** and spoke to an unidentified prostitute. CHONG said in her stores, the phones are not allowed to be unmanned and is upset the girls did not pick it up. CHONG asked, "What, you think you're here to have fun? Open you legs to make money?" CHONG told the prostitute she wants her out because she thinks too highly of herself.

97. On August 23, 2007, CHONG placed a telephone call to **Premises 6**. CHONG asked an Asian female who she called "Lily" to sleep at her house because she wanted to introduce her to someone in the morning. CHONG told "Lily" she invited the "white godfather" over to her house in order to meet "Lily." CHONG said it would not be too expensive, because it's from friends. CHONG stated she doesn't like to talk about this type of business over the phone. Surveillance of **Premises 5** on August 24, 2007, confirmed that CHONG invited a man over to **Premises 5** to meet

46

"Lily." It is believed that CHONG was attempting to arrange a fraudulent marriage on behalf of "Lily" and was going to pay the man if he was interested in getting married to "Lily."

98. On September 4, 2007, CHONG made a telephone call to **Premises 6.** CHONG spoke to an unidentified prostitute she called Coco and asked if Coco did the Judge's friend who is short, and is claiming he did not get service from Coco after he paid the sixty dollar house fee plus a tip. Coco told CHONG the guy wanted a full set (sexual intercourse) for forty dollars. CHONG turned to the customer in the background and said they don't do this one, they only do massage. Coco tried to argue with CHONG who said not to talk about this over the phone and the call was disconnected.

99. On September 13, 2007, CHONG made a telephone call to **Premises 6.** CHONG told an Asian prostitute named Coco to make sure the girls remember to take the phones with them when they work. CHONG told Coco that right now government officials are calling and snooping around and asking dubious questions. CHONG told Coco to talk wisely to the customers and tell them it is acupressure. CHONG said there are people from Hawaii and the Buffalo Police went to other places.

47

100.   On September 20, 2007, CHONG received a telephone call
from **Premises 6.**   Tony (last name unknown) LNU used the brothel
phone to talk to CHONG concerning his previous visit to **Premises 3.**
He stated that nothing happened because the girl did not know him.
CHONG told Tony LNU "the girl there today is very nice and will
take care of him."   CHONG then spoke to an Asian female who she
called "LA LA" and told her Tony LNU is a known customer.   "LA LA"
told CHONG she knew Tony LNU and that an Asian female whom CHONG
called "Lily" didn't know him so she would not do the "hand job"
for him the day before.   CHONG told "LA LA" Tony LNU prefers "big
service" and reminded her not to talk about this over the
telephone.

101.   On September 27, 2007, CHONG placed a telephone call to
**Premises 6.**   CHONG told an unknown Asian female that they are only
to perform "pure massages" on Asian customers.   It is common for
brothel owners to instruct their Asian female workers to only
perform "pure massages" (massages without any sexual contact) on
Asian customers.   This is to limit the Asian females' exposure to
possible undercover police officers and or Asian informants.   It
also limits their ability to communicate in their native tongue
with customers that speak the same language, which in turn could
expose their living conditions and or their illicit business
arrangements.   It is believed that CHONG was advised by and unknown

48

party that the police have used Asian informants in cases against
brothel owners.

102. On September 30, 2007, CHONG made a telephone call to
**Premises 6**. CHONG spoke to an Asian prostitute named Lily and told
her that the police left. CHONG told Lily that the police officer
said he would like to try massage sometime. CHONG said the Judge
and his friends he brought over wanted it for free and they were
bad tippers. There were a lot of free services at Golden. One
customer gave fifty dollars in Canadian money as the tip for a big
job (sexual intercourse). CHONG told Lily when CHONG complained
about this to the Judge, he was upset.

103. On October 01, 2007, CHONG placed a telephone call to
**Premises 6**. CHONG told an Asian female whom she called "Er Jie"
that government officials are visiting the massage parlors and are
purposely not giving the girls tips. CHONG stated that this
practice by government officials is an attempt to make the girls
upset. CHONG advised "Er Jie" to tell the other girls of this
information.

104. On October 13, 2007, CHONG received a telephone call
from **Premises 6**. An Asian female whom CHONG referred to as "LA LA"
told CHONG she and "Lily" wanted to go to the casino to gamble.

CHONG advised "LA LA" to save her money and invest in real estate because the value of property is going up in the Western New York area.   CHONG told "LA LA" she wanted to buy some real estate property with her younger sister-in-law, "LA LA" and "Lily" but it could not be titled in CHONG'S name.

105.   On October 28, 2007, CHONG received a telephone call from **Premises 6**.   An Asian female whom CHONG referred to as "Er-Jie" talked to CHONG about accepting credit cards from customers. CHONG told "Er-Jie" it is not safe to take credit cards and became very upset.   "Er-Jie" told CHONG she warns the girls when they try to accept credit cards from customers.   CHONG stated the girls only make money if she makes money, so they should listen to her.   CHONG said the girls still must do it even if the customers do not give tips.

106.   On November 9, 2007, CHONG placed a telephone call to **Premises 6**.   CHONG asked an Asian female whom she referred to as "COCO" to make sure she writes down the money for their work.

B.   **Defendants**

107.   On August 9, 2007 CHONG received a telephone call from K. CHONG.   CHONG and K. CHONG discussed an individual they

identified as "Mai" who was diagnosed with a sexually transmitted disease and they feared a girl named Lily may have been infected, but was found not to be. K. CHONG stated, "There is another thing, what thing...oh, about A-Mai, right? Didn't he say that he had himself checked for STD? He has STD, right? So he is suspecting Lily, other girls. Lily doesn't have STD, but there are three to four other girls, have to be checked". CHONG stated, "Did you tell him that she is negative for STD? Did you tell him"? K. CHONG replied that he told him. K. CHONG stated, "So I said to him...you brought garbage to Lily, now Lily is mad..now everyday, I still want to say...and I tell him he has to compensate money". CHONG told K. CHONG not to create drama with "A-Mai." This call demonstrates K. CHONG'S knowledge with respect to sexual activities at the brothels and how the women working there having STDs could affect business.


108.    On August 10, 2007 CHONG made a telephone call to Premises 5 and spoke to TSUI. While waiting for someone to answer the phone, CHONG was yelling at someone for not making the beds. CHONG told TSUI that she was very mad with the girls in her store because everything is so messy.


109.    On August 13, 2007, CHONG received a telephone call from TSUI. CHONG told TSUI she wanted to end the call because she was

calling someone else to look for girls.  It is believed CHONG was
referring to recruiting new prostitutes for the brothels.  In these
types of operations, it is essential to keep bringing in new women
for the customers.

110.  On August 14, 2007 CHONG made a telephone call to K.
CHONG.  CHONG told K. CHONG that the girls cut the service time
short and the customers will be unhappy because they have paid
sixty dollars for one hour.

111.  On August 14, 2007, CHONG told K. CHONG she wanted to
discuss letting Amy back because many girls don't have status and
Amy knows CHONG's store is stable.  CHONG told K. CHONG that in the
last two weeks two stores were raided.  CHONG pointed out that Amy
has legal status and will file a tax return.  CHONG said, "As you
know, we have been filing it for the last two years."  CHONG told
K. CHONG she would put Amy in Lockport, even though she has an
attitude problem.  CHONG asked K. CHONG for his opinion and he said
he did not have one, that he just wanted her to remain careful.
CHONG told K. CHONG she was stunned when she read that, "piece of
paper of yours", because only one or two of them have real green
cards, for the rest of them, they are still waiting for it.  K.
CHONG responded if they are waiting for it, it's no problem, as
long  as  they  have  some  status  it  will  be  fine.    This  call

demonstrates K. CHONG'S knowledge that the immigration status of the girls in the brothels is an important issue, especially if/when the stores are raided by police.

112.  On August 15, 2007 CHONG received a telephone call from Premises 5 and spoke to TSUI.  CHONG told TSUI she was driving to Lotus (Premises 6) because Lily is leaving.  TSUI asked CHONG if she is able to take care of it and CHONG said she was.  Lily is a prostitute at Lotus and CHONG discusses Lily with TSUI as if he knows of her.  TSUI'S question to CHONG suggests he realizes the significance of Lily's leaving.

113.  On August 15, 2007 CHONG received a telephone call from Premises 5 and spoke to TSUI.  CHONG told TSUI that the Canadian woman is crazy because she wants to go back.  Previous intercepts have included this same woman having asked CHONG for assistance in obtaining a Visa.  The Canadian woman CHONG is speaking of is a prostitute.

114.  On August 22, 2007 CHONG made a telephone call to Premises 5 and spoke to K. CHONG.  CHONG told K. CHONG that Helen does not want to stay even though CHONG tried to keep her.  CHONG said the reason Helen does not want to say is that Coco always pushes the bad tipping customers to the other girls and waits to

take the good tipping customers. CHONG said that Helen does not want to go but that Coco is too aggressive and grabs all the good tipping customers. CHONG asked K. CHONG to pretend that he does not know what is going on, but he said that he already knew about it. As already mentioned herein, the tipping is how the girls are compensated for illegal sexual activities beyond the "normal" massage fee.

115. On August 23, 2007 CHONG made a telephone call to Premises 5 and spoke to K. CHONG. CHONG told K. CHONG she just called his store (Premises 6) and asked to talk to Coco. CHONG asked Coco if she has to study until one p.m. every day which would make her only able to work part time. CHONG told K. CHONG she wants to put Coco in Lockport because the customers are walking away from the "old ladies" there and that some customers have specifically requested Coco. CHONG told K. CHONG that Coco is not sure and has to see if she can be excused from class early so she can go to Lockport next week. This call is significant because CHONG refers to one of the brothels as K. CHONG'S store. It is believed this means K. CHONG is responsible for its management.

116. On August 24, 2007, CHONG told K. CHONG that Lily did not tell her she spoke with Lala and that Lily does not want to be rotated from Niagara Falls Boulevard. CHONG told K. CHONG that she

will put Lala in Lockport and if that does not work CHONG will start looking for girls. CHONG told K. CHONG that Lockport does not have any business and that Mary is leaving on the 27th or the 28th. CHONG told K. CHONG that because the new girl is leaving on the 29th, she is having Lala over on the 30th.

117. On September 2, 2007 CHONG made a call to Premises 5 and spoke to K. CHONG. CHONG told K. CHONG that there were no customers today. K. CHONG said it was okay because it was a holiday. K. CHONG further said it was a once a year holiday and it should be over with on Monday.

118. On September 4, 2007, CHONG told K. CHONG she yelled at TSUI last night. K. CHONG told CHONG he told TSUI that CHONG is very busy now due to the shortage of girls, and told TSUI not to bother CHONG.

119. On September 7, 2007 CHONG made a telephone call to Premises 5 and spoke to K. CHONG. CHONG asked K. CHONG to call telephone number 718-683-6326 (This telephone number belongs to Degui Zhang, the cooperating victim) to remind the taxi driver to bring the girl and to give directions to Golden (Premises 1) to the taxi driver.

120.   On September 11, 2007, CHONG received a telephone call and spoke to TSUI.   CHONG told TSUI that she has no girls tomorrow and needs to use the girls in Kim's (K. CHONG) store.

121.   On September 13, 2007 CHONG made a telephone call to Premises 5 and spoke to TSUI.   CHONG told TSUI she was on her way to Kim's Place (Premises 6) and then going to Lockport (Premises 3).   CHONG told TSUI she returned home at two a.m. this morning since the bus driver was a new hand.   Surveillance conducted on this day revealed that CHONG picked up a new girl at Shun Fa Bus Line and took her to Premises 6.   This call indicates TSUI is familiar with the use of the private Chinese bus line to bring girls into the area to work in these brothels.

122.   On September 16, 2007 CHONG received a telephone call from Premises 5 and spoke to TSUI.   CHONG told TSUI she was just leaving Lockport (Premises 3).   CHONG told TSUI that the girl's temper is not good.   CHONG said that the girl won't come out to work on the customer if she does not like the customer.   This call is significant because it is not normally believed to be an element of legitimate massage whether the customer is liked or disliked by the masseuse.   Such a factor may be more relevant where sexual activities with the customer are involved.

123. On September 16, 2007 CHONG made a telephone call to Premises 5. CHONG told ZHANG that she had to take Coco back to Golden that night. CHONG asked ZHANG to check the rice container and pick up the stuff she left there. CHONG told ZHANG that there were only two (customers) in her place (Premises 6) that night. This call is significant because CHONG is discussing one of the prostitutes with ZHANG as if she (ZHANG) would know of her, and also because CHONG is once again directing ZHANG TO the hidden cash proceeds in the residence.

124. On September 17, 2007, CHONG told ZHANG she was in traffic and that she had not yet collected the money from the girls. CHONG told ZHANG that the girls in Lockport asked CHONG to put an advertisement in the newspaper. CHONG said that business was not good yesterday and that each of the girls only had two customers. CHONG told ZHANG that when she went to her shop (ZHANG's), Lily wasn't even ready to give her the money. CHONG told ZHANG that they will put two days worth of money together for tomorrow. This call is significant because CHONG refers to a brothel location as ZHANG'S, suggesting ZHANG is responsible for the management of the location. CHONG also refers to Lily, a prostitute at the location, as if ZHANG knows who she is.

125.   On September 18, 2007, CHONG made a telephone call to Premises 5 and spoke to TSUI.   CHONG told TSUI she had someone introduce a new girl tomorrow and that CHONG will have to pick up the new girl in the evening.   CHONG asked TSUI to remind CHONG to pick up the girl.

126.   On September 19, 2007 CHONG made a telephone call to Premises 5 and spoke to TSUI.   CHONG stated, "I am thinking of changing a bit on my profession.   I want to do pure massage.   What do you think?"   From the wire interceptions, it is known that pure massage indicates a massage without sexual favors.   This call is significant because CHONG is clearly distinguishing to TSUI between pure massage (known by your affiant from my training and experience to be a reference in this trade to legitimate, legal massage) and what the massage locations are presently doing.   The call then demonstrates TSUI'S knowledge of the illegal activity at the brothel locations.

127.   On September 19, 2007 CHONG received a telephone call from Premises 5 and spoke to ZHANG.   CHONG told ZHANG she was on the way to Golden (Premises 1) to collect money.   CHONG complained to ZHANG that Coco in Niagara Falls Boulevard (Premises 6) was going home this Saturday again.   CHONG told ZHANG that the girl coming tonight is a friend of Lala.   CHONG told ZHANG that she does not want these girls to gang up on her to fire Ling Ling.   This call is a good illustration of the degree to which CHONG trusts ZHANG with

58

knowledge regarding the comings and goings of the girls and in using
names of the prostitutes, she (CHONG) does not need to describe who
these girls are to ZHANG.

128.   On September 20, 2007 CHONG made a telephone call to
Premises 5 and spoke to ZHANG.  CHONG told ZHANG that she had to go
to Lotus because there was a customer that she had to take care of.
CHONG explained the customer was in Lockport yesterday, and that he
is a cheap customer who won't pay anything but wants a lot (sexual
intercourse).  ZHANG told CHONG to go and take a look.  CHONG said
that business is bad, there were only two customers in Lockport and
one requested a refund.  CHONG told ZHANG the new girl is no good
and that CHONG will ask Coco to help out.  CHONG stated the new girl
cried all day and CHONG is angry and is going to send her away.
CHONG told ZHANG the new girl is mad at CHONG and wants to go home.
The new girl refused to work on a bad customer and told CHONG she
cannot force her to do it.  CHONG told ZHANG she told the new girl
not to upset the customers and the boss.  CHONG told ZHANG they need
an experienced girl there, otherwise it will be impossible.  CHONG
stated the new girl upset all of the customers.  CHONG told ZHANG
the new girl was a school principal of a primary school in China for
eighteen years and she understands English well.  ZHANG is surprised
at this and asked CHONG why she is doing this here.  CHONG said her
husband has another woman.  CHONG made the comment that once one
gets into this business, one can't bow her head any lower.  CHONG
has to go pick up TSUI's sister and the girl.  CHONG does not know

where to put the girl for the night.   CHONG told ZHANG she would put the girl with Lily (Premises 6) and ZHANG said it was up to CHONG. CHONG said she arrived at ZHANG's store (Premises 6) and has to go. This call between CHONG and ZHANG contains several references to circumstances which would not be present in a legitimate massage operation, in particular, the new girl crying and stating that she can't be forced to work on a "bad customer."   In addition, ZHANG'S surprise at why a school principal from China (a good, honorable type of job) would come to the U.S. to this type of job suggests ZHANG'S knowledge that working in these locations is not honorable work.

129.   On September 20, 2007 CHONG made a telephone call to Premises 5 and spoke to ZHANG.   CHONG told ZHANG that the two newest girls, Helen and the other one, asked customers for tips and that it is not acceptable (when a girl asks for tips, that indicates they provided a sexual favor).   CHONG said they asked to work at CHONG"s brother's place (Premises 6).   CHONG indicated that Lily and Lala were doing fine there (Premises 6) and that she will find another way.

130.   On September 20, 2007, CHONG received a telephone call from TSUI.   CHONG complained to TSUI about the Fuzhou girl's refusal to accept money from a customer.   CHONG is afraid that the actions of the girl will anger her customers.   TSUI commented that the girl

will be leaving soon.  CHONG replied to TSUI, "But we have to wait for girls to come up first".

131.  On September 21, 2007 CHONG made a telephone call to Premises 5 and spoke to ZHANG.  CHONG complained to ZHANG that the new girl is very demanding when she asks CHONG for groceries by asking for beef, pork, and ribs.  The new girl asked her for pork chops.  CHONG told ZHANG she just left Sam's Club and was going to go to Lockport to collect the money.  ZHANG told CHONG she needed to go to the bank.  This call goes to ZHANG'S knowledge that the girls do not leave the premises (as they need groceries brought to them), which is not normal for a legitimate massage operation and is also a typical indicia of illegitimate massage operations employing illegal aliens.

132.  On September 21, 2007, CHONG told TSUI that K. CHONG wants to talk to him.  CHONG said it was K. CHONG's understanding that Third Street (Lotus Spa Niagara Falls **Premises 4**) had been paid off in full by installments already, and yet there was a check returned due to insufficient funds.  CHONG asked TSUI if the place had been paid off in full.  TSUI acknowledged that it was paid off.

133.  On September 29, 2007 CHONG made a telephone call to Premises 5 and spoke to ZHANG.  CHONG told ZHANG she was short on girls because two girls at Golden (Premises 1) left and that she was

trying to find more girls.  CHONG complained there was one customer
yesterday and the spa only had two the whole evening.

134.  On September 30, 2007, CHONG told ZHANG the police went
to her store and then to CHONG's store.  Lily and the other girls
were scared to death.  The young policeman went to CHONG's store
after Lily called.  CHONG is scared and is going to take Coco to her
home because of Coco's status.  CHONG told ZHANG she should
understand that.  This call goes to ZHANG'S knowledge that a police
presence in the stores is upsetting to the girls and to CHONG.

135.  On October 15, 2007 CHONG made a telephone call to
Premises 5 and spoke to TSUI.  CHONG told TSUI she picked up the
girl from Lockport and complained to TSUI that there was no business
there and that the girls are leaving at the same time.  CHONG told
TSUI she called the Malaysian girl to come and help her.  CHONG
asked the Malaysian girl to come over tomorrow.

136.  On October 17, 2007 CHONG received a telephone call from
Premises 5 and spoke to TSUI.  CHONG complained to TSUI that the
Malaysian girl who is demanding more money has an unpleasant
appearance that it turning away the customers.  An unpleasant
appearance may be considered a more significant issue if a masseuse
and a business rely on the tips generated from sexual activities
beyond a normal massage.

137. On October 17, 2007, CHONG made a telephone call to the residence and spoke to ZHANG.   CHONG reminded ZHANG that her money is in the rice box.

138. The investigation has continued to date and the pattern of activities described <u>supra</u> has continued.   All brothels continue to appear operational.   As this has been consistent throughout the 15 month investigation, your affiant submits that the offenses have continued and are continuing and therefore there is probable cause to believe the fruits, instrumentalities and evidence of said crimes will be located in the places to be searched as described in this affidavit.

## VI.   ITEMS TO BE SEIZED

139. Inasmuch as the above described premises are believed to be locations where aliens are being kept, maintained, controlled, supported, and/or harbored for purposes of prostitution and/or other immoral purpose, and/or where the targets who engage in these criminal offenses are believed to reside, I believe that it is more probable than not that a substantial quantity of documents and other items related to these violations of federal law may be found.[5]

---

[5]   It should be noted that in order to prove violations of the offenses listed in this affidavit, the Government would be required to prove each and every element of the statues beyond a reasonable doubt.   Thus, while 18 USC Section 2424 requires a certain factual statement be filed with immigration authorities, this requirement is not even triggered unless the Government can prove that the

Such records are often maintained for substantial periods of time, particularly as such records relate to ownership of businesses and residences, bank records, identity documents, and the like. I also believe, based on my investigation in this case, my past experience as a SA, and conversations held with SAs who have worked similar cases in the past, that there is probable cause to believe that the following specific types of evidence, fruits and instrumentalities of the above-described federal offenses will be found:

140. Identity documents of the United States or any foreign government including, but not limited to, passports, visas, entry documents of any kind, drivers licenses, and documents used in support of any application for benefits in the United States;

141. Financial and other records relating to the prostitution and harboring activities, but not limited to books, business records, receipts, notes, ledgers, journals, memoranda, photographs, and/or video cassettes, address and/or telephone books, answering machine cassettes, and any other documents, devices, or instruments capable of storing such information, whether stored in documentary or electronic form;

---

defendants violated the other elements of the law. Therefore, under the provisions of Rule 41 of the Federal Rules of Criminal Procedure, the Government seeks the authority to search for and seize fruits, instrumentalities and evidence which go to any and all elements of the offenses listed herein.

142.  Papers, tickets, notes, schedules, receipts and other items relating to domestic or foreign travel; whether stored in documentary or electronic form;

143.  Books, records, receipts, bank statements and records, money drafts, letters of credit, money orders and cashiers checks (and receipts), passbooks, bank checks, bank deposit tickets, safes, safe deposit box keys, securities, memoranda and other evidence of financial transactions relating to obtaining, secreting, transferring, and/or concealing assets and/or obtaining secreting, transferring, concealing and/or spending money, whether stored in documentary or electronic form;

144.  United States currency, precious metals, jewelry and other items of value and/or proceeds of prostitution and or harboring activities, to include casino chips (used in money laundering activities);

145.  Cellular telephones which are capable of storing photographs, phone numbers and other information; and

146.  Indicia of occupancy, residency and/or ownership of the premises described above, and indicia of the conspiracy including, but not limited to, utility and telephone bills, cancelled

envelopes, photographs, video cassettes, mail, and keys; whether
stored in documentary or electronic form.

147.   By this search warrant, I also request permission to take
photographs and/or video recording of any evidentiary items or crime
scene(s) at time of search.

### SURVEILLANCE SYSTEM

148.   Although CHONG is intercepted making reference to her
ability to observe others from a remote location, it is unknown if
a video surveillance system is installed at any of the premises
described herein.   However, based upon my training and experience,
I know that it is not uncommon that such surveillance systems be
utilized by individuals involved in the above-described criminal
violations.   Accordingly, if any such system is installed, then
there is probable cause to believe that said system will be capable
of recording and storing images that would serve as evidence of the
subject offenses, as well as the identities of those aliens and
customers who have been engaged in or otherwise assisted with the
illegal activities described herein.   Therefore, it is respectfully
requested that the warrant sought by this application authorize the
seizure of any storage media associated with such a system, whether
recorded in an analog or digital format.

## COMPUTERS AND/OR COMPUTER DATA

149.   I know from my personal knowledge, training and experience, that in today's environment many individuals and companies that engage in activities of the type and on the scale of those described herein (travel between China and US, frequent in-country travel, frequent replacement and travel of massage parlor employees, fees collected and charged to employees and customers, etc.) use computers to produce, deliver and maintain many of the records described above, and that these records are also maintained for a long time period.

150.   I also know that computer hardware, software, documentation, passwords and data security devices may be important to a criminal investigation in two distinct respects:  (1) the objects themselves may be instrumentalities or evidence of a crime, and/or (2) the objects may have been used to collect and store information (in the form of electronic data) which constitutes evidence of that offense.

151.   On the basis of the facts set forth herein, in the event computers are located within any of the above premises, I believe there is probable cause to believe that computer hardware, software, documentation, passwords and data security devices are evidence and instrumentalities of the crimes, specifically to create documents or to communicate information that is relevant to the criminal

violations described herein.  Any such computer hardware, software, documentation, passwords and data security devices constitute means of committing criminal offenses, and are thus instrumentalities in, as well as evidence of, the violations recited herein.

152.  Based upon my consultations with certified computer forensic examiners, I know that searching and seizing information from computer systems and other storage media often require agents to seize most or all of the computer system or storage media to be searched later by a qualified computer forensic examiner in a laboratory or other controlled environment.

153.  Accordingly, there may be a reasonable need to remove the computers and computer-related equipment to a forensic setting in order to properly conduct a thorough search of the contents.  Such action will greatly diminish the intrusion of law enforcement into the premises and will ensure that evidence can be searched for without the risk of losing, destroying or missing the information/data for which there has been authorization to search.

154.  However, bearing in mind the impact of seizing such equipment would have on business operations, every reasonable effort will be made to image electronic information at the search site and thereby avoid seizing computer hardware critical to business operations.  If this can be done on-site, the data seized will then

be forensically examined at the forensic facility in order to determine if any evidentiary information/data are located therein.

155.   Therefore, it is respectfully requested that the warrant sought by this application authorize the search and seizure of all computer hardware, computer software, related storage media, and other devices which may contain or assist in the retrieval of the records and documents pertaining to the export of controlled items.

## CONCLUSION

156.   For all of the reasons set forth above, I respectfully request that the Court issue search warrants for Premises 1 to 6, a Complaint charging the offenses described, and arrest warrants for the four (4) persons charged in said Complaint.

157.   Finally, because of the nature of the above described information, as well as the fact that this investigation is continuing, I request that this affidavit, the accompanying applications for search warrants and the Criminal Complaint all be sealed until further order of the Court.


JENNIFER J. AMO
Special Agent
Federal Bureau of Investigation



Sworn to and subscribed before me
this _____ day of December, 2007,

NUNC PRO TUNC TO DECEMBER 8, 2007


HONORABLE JEREMIAH J. McCARTHY
United States Magistrate Judge







Exhibit C



Exhibit D



Exhibit E

